Shelly **RAKOCZY**, Plaintiff,

v.

The **TRAVELER'S INSURANCE COMPANY**, Defendant.

Civ. A. No. 95–40307.

United States District Court,
E.D. Michigan,
Southern Division.

March 31, 1997.

Michelle V. Thurber, Thomas G. McNeill, Wright, Dickinson, Moon, Vandusen & Freeman, Bloomfield Hills, MI, for defendant.

John A. Maksym, Garrett & Maksym, Detroit, MI, for plaintiff.

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

GADOLA, District Judge.

The instant case was brought by plaintiff Shelly Rakoczy against defendant Travelers Insurance Company on January 27, 1995. Plaintiff challenges the denial of her claim for payment of medical benefits relating to medical treatment she received in April, 1994. The matter is presently before this court on defendant's renewed motion for summary judgment filed September 4, 1996. The parties have stipulated to this court's deciding the motion based upon their written submissions. For the following reasons, defendant's motion will be granted.

## I. FACTS

Defendant issued a group medical insurance policy to plaintiff's employer, Group S.A.A. Limited and Photo Concepts (hereinafter "Photo Concepts"), as part of its employee welfare benefit plan (hereinafter "Plan"). The Plan became effective on January 1, 1994. The Plan excludes coverage for "pre-existing conditions." The pertinent Plan provisions read:

**Pre-existing Conditions**

A covered person may have received medical care or treatment for an injury or sickness at any time during the 6 months before coverage starts under this Plan. In this case, coverage under this benefit will be postponed for the injury or sickness until the earliest date below:

— 6 months after the last time care of treatment was given for the injury or sickness.

— For you, when you have been covered under this Plan during active work for 12 months.

— For a dependent, when that person has been covered under this Plan for 12 months.

In April, 1994, plaintiff was diagnosed with a large ovarian cyst, which was surgically removed. Plaintiff filed a claim with defendant for her treatment costs, totaling over $7,000.00. While investigating the claim, defendant requested a description from each of plaintiff's doctors of the treatment that plaintiff had received during the six months prior to the effective date of the Plan, January 1, 1994. Plaintiff's physician prior to 1994, Dr. Deidre Wickham ("Dr. Wickham") responded with the following notations:

8–12–93 Recheck for Ovarian Cyst

10–28–93 Recheck for Ovarian Cyst

11–4–93 Ultrasound for Ovarian Cyst

11–22–93 D & C/Laparoscopy

12–9–93 PO

3–3–94 Infection

Based on these representations by Dr. Wickham, defendant concluded that the ovarian cyst which was removed in April, 1994 was a pre-existing condition and not covered by the Plan. On October 18, 1994, defendant sent notification to plaintiff of its decision to deny plaintiff benefits.[1]

On January 27, 1995, plaintiff filed the present suit in state court alleging that benefits had been wrongfully denied. The suit was removed by the defendant to this court. On October 30, 1995, defendant filed a motion for summary judgment on the grounds that: (1) the claim administrator's decision to deny benefits was compelled by the pre-existing condition provision in the Plan, and (2) the plaintiff's claims were barred for failure to follow administrative procedures.[2]

This court denied defendant's motion, finding that defendant had not properly notified plaintiff of its decision to deny her benefits in conformity with ERISA notification requirements set out at 29 U.S.C. § 1133.[3] Thus, this court ordered: (1) defendant to furnish plaintiff with notification comporting with the statutory requirements within 10 days; (2) plaintiff to provide defendant with any additional information in support of her claim within forty-five days; and, (3) defendant to render its final decision regarding plaintiff's claim to both the plaintiff and this court within ninety days.

In accordance with this court's order, defendant sent plaintiff proper notification informing her of its denial of her claim. Plaintiff, in return provided some additional medical records, those of Dr. Edwin Lichten ("Dr. Lichten"), Sinai Hospital, and Dr. Lisa Elconin ("Dr. Elconin"), as well as the affidavit of Dr. Lichten.[4] All the medical records related to her treatment from January, 1994 through April, 1994, after coverage commenced. Not one of the records furnished by plaintiff related to the treatment she received during the six-month period immediately preceding the initial coverage date for purposes of determining whether the surgery at issue was necessitated by a pre-existing condition. Notably, plaintiff did not provide any information from Dr. Wickham, the physician who treated her in 1993 for an ovarian cyst. Consequently, defendant, of its own accord, requested and reviewed Dr. Wickham's medical records regarding plain-

---

**1.** In response, plaintiff sent a letter dated December 6, 1994 to defendant, requesting a review of her claim. Defendant denies ever receiving such a letter. In the letter, plaintiff insists that she was assured by Dr. Wickham in November 1993, that there was nothing wrong with her. The letter further explains that plaintiff did not begin experiencing symptoms until January, 1994 for the cyst that was removed in April, 1994.

**2.** As aforementioned, defendant denied receiving a letter from plaintiff requesting a review of her claim. Such a letter is a pre-requisite to an appeal of a claim.

**3.** 29 U.S.C. § 1133 mandates that every employee benefit plan shall "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the reasons for such denial, written in a manner calculated to be understood by the participant." The written notice of denial shall include: (1) the specific reasons for the denial; (2) reference to the pertinent plan provisions on which the denial is based; (3) a description of the material necessary for a claimant to perfect her claim; and (4) information regarding the procedure a claimant can pursue to obtain review of the claim. 29 C.F.R. § 2560.503–1(f).

**4.** The affidavit of Dr. Lichten and its relevancy to defendant's summary judgment motion is addressed at pages 17–20 of this opinion and order.

tiff's medical treatment for the six-month period prior to commencement of the Plan. The medical history of plaintiff from November, 1993 through April, 1994, as revealed by these records will now be discussed in detail.

### A. Plaintiff's Medical History from 1993–1994

On November 4, 1993, plaintiff underwent a pelvic ultrasound at the direction of Dr. Wickham. The reason for the scan was "endometriosis."[5] This test revealed a "clear cyst with irregulal [sic] walls," measuring 2.4 × 1.0 × 2.0 cm in size.

On November 22, 1993, plaintiff underwent a dilation and curettage ("D & C"),[6] followed by a laparoscopy[7] and laser ablation. These operations were performed by Dr. Wickham at Botsford Hospital in order to remove small scattered areas of endometriosis, specifically located in the cul-de-sac as well as on the left ovarian fossa. Plaintiff's condition was consistent with a "hormonal effect."

In January, 1994, plaintiff sought treatment for lower back pain from Sinai Hospital Pathology Services under the care of Dr. Lichten. On February 1, 1994 she re-visited Dr. Lichten complaining of re-occurring back pain and tenderness under the lower ribs. Dr. Lichten prescribed antibiotics and scheduled her for an April 15, 1994 ovarian appointment.

Prior to her April 15, 1994 appointment, she also visited Dr. Elconin. Dr. Elconin referred her to Dr. Peter H. DeRidder ("Dr. DeRidder"), a gastrointestinal specialist. In a letter to Dr. Elconin dated March 25, 1994, Dr. DeRidder indicates that his professional "impression" was that plaintiff suffered "pelvic pain with mild constipation during men-

strual cycle with known endometriosis, possible sigmoid involvement with component of irritable bowel."

On April 22, 1994, a pelvic ultrasound was ordered, apparently by Dr. Elconin. The impression of that test was as follows:

> There is a large complex partially cystic mass noted posterior to the uterus believed to be arising from the left ovary. The cystic component measures 6.7 cm in greatest dimension and contains a central somewhat mobile solid component measuring 4.7 cm. This may represent an ovarian cyst which has been complicated by either hemorrhage or infection with secondary concretion of internal debris or blood. However, with a history of endometriosis, this may also represent an endometrioma which likewise has had internal hemorrhage that has otherwise solidified. Direct visualization is recommended.

After the ultrasound, plaintiff was referred for surgery. On April 28, 1994, plaintiff was admitted to Sinai Hospital. Dr. Lichten removed plaintiff's left ovary, including the seven inch cyst found on that ovary through a procedure known as a "larascopic left oophorectomy." He also curetted endometrium. A pathological analysis was performed on both the endometrial curetting and the left ovary by Dr. Richard M. Zirkin ("Dr. Zirkin") on April 30, 1994. Dr. Zirkin's test of the endometrial curetting revealed "inactive endometrium," or in other words a condition of the uterine tissue which results from taking birth control pills. His examination of the left ovary led him to the conclusion that the cyst found thereon was a "corpus luteum cyst."[8] Dr. Lichten requested further

---

5. Endometriosis is a "condition in which tissue more or less perfectly resembling the uterine mucous membrane [the endometrium] occurs aberrantly in various locations of the pelvic cavity." Dorland's Illustrated Medical Dictionary 449 (23d ed.1957). Plaintiff describes this condition as an abnormal occurrence of the endometrial tissue which frequently forms cysts containing blood or gas.

6. This is a procedure in which the uterus is dilated or stretched and then a kind of scraper or spoon is inserted to remove growths or other matter from the walls of the uterine cavity.

7. A laparoscopy is an examination of the interior of the abdomen. It is an operation in which the abdominal cavity (including the reproductive organs) is probed after inserting an instrument known as a laparoscope near the navel. Dorland's Illustrated Medical Dictionary 729 (23d ed.1957).

8. "Corpus luteum" is a yellow mass in the ovary formed by a graafian follicle, i.e. a small vesicular sac embedded in the cortex of the ovary containing an egg cell or ovum, which has matured and discharged its ovum. Dorland's Illustrated Medical Dictionary 318 (23d ed.1957).

pathological testing on the cyst, and a more detailed study of the cyst was conducted by Dr. Zirkin. His "Surgical Addendum Report" dated May 11, 1994 reads in relevant part as follows:

*Addendum*

This case has been reviewed at the request of the attending Gynecologist [Dr. Lichten]. Additional sections are examined. In some of these there is a small amount of low columnar epithelium[9] lining the cystic space. The underlying stroma[10] is luteinized[11] and there is a small amount of hemosiderin pigment.[12] Given the information that patient has been on birth control pills findings are compatible with a diagnosis of endometriosis.

DIAGNOSIS: LEFT OVARY—BENIGN CYSTIC LESION COMPATIBLE WITH ENDOMETRIAL CYST (ENDOMETRIOSIS).

Upon a second review of plaintiff's claim file based on all the aforementioned medical records, defendant again determined to deny plaintiff's claim. It was unclear to the defendant whether the cyst removed in 1994 was the same cyst detected by Dr. Wickham six months prior to the date of the Plan, specifically on November 4, 1993. However, the defendant concluded that at the very least the cyst removed in 1994 was caused by the chronic endometriosis from which plaintiff suffered and for which plaintiff was treated from August through December, 1993. After denying her claim for the second time, defendant renewed its motion for summary judgment contending that its decision was rationally motivated by the pre-existing condition provision in the Plan.

## II. ANALYSIS

### A. Summary Judgment

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." "A fact is 'material' and precludes grant of summary judgment if proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect [the] application of appropriate principle[s] of law to the rights and obligations of the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir.1984) (citation omitted). The court must view the evidence in a light most favorable to the nonmovant as well as draw all reasonable inferences in the nonmovant's favor. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Bender v. Southland Corp.*, 749 F.2d 1205, 1210–11 (6th Cir.1984).

The movant bears the burden of demonstrating the absence of all genuine issues of material fact. *See Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 861 (6th Cir.1986). This burden "may be discharged by 'showing'— that is, pointing out to the district court— that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Once the moving party discharges that burden, the burden shifts to the nonmoving party to set forth specific facts showing a genuine triable issue. Fed.R.Civ.P. 56(e); *Gregg*, 801 F.2d at 861.

To create a genuine issue of material fact, however, the nonmovant must do more than present some evidence on a disputed issue.

9. "Columnar epithelium" is lining consisting of tall prismatic cells joined by small amounts of cementing substances. Dorland's Illustrated Medical Dictionary 464 (23d ed.1957).

10. Stroma means the connective tissue of the ovary. Dorland's Illustrated Medical Dictionary, 1314 (23d ed.1957).

11. "Luteinization" is the process taking place in the follicle cells of the graafian follicles which have matured and discharged their egg. Dorland's Illustrated Medical Dictionary 779 (23d ed.1957).

12. "Hemosiderin pigment" is a dark-yellow pigment containing iron, found in various phagocytic cells, i.e. cells that ingest microorganisms, of the blood. Dorland's Illustrated Medical Dictionary 606 (23d ed.1957).

As the United States Supreme Court stated in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986),

> There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [nonmovant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

(Citations omitted). *See Catrett*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). The evidence itself need not be the sort admissible at trial. *Ashbrook v. Block*, 917 F.2d 918, 921 (6th Cir.1990). However, the evidence must be more than the nonmovant's own pleadings and affidavits. *Id.*

### B. Legal Standard for Review of Defendant's Decision to Deny Plaintiff's Claim

 This court previously held that the defendant's decision to deny plaintiff benefits should be reviewed in accordance with an "arbitrary and capricious" standard. *See Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 109, 109 S.Ct. 948, 953–54, 103 L.Ed.2d 80 (1989) (holding that a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under an arbitrary and capricious standard if the plan gives the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan); *Davis v. Kentucky Fin., Cos. Retirement Plan*, 887 F.2d 689, 693–94 (6th Cir.1989); *Varhola v. Doe*, 820 F.2d 809, 813 (6th Cir.1987).[13] Under this highly deferential standard of review, the outcome of the plan administrator will be upheld if "it is possible to offer a reasoned explanation, based on the evidence, for [that] particular outcome...." *Davis*, 887 F.2d at 693 (*quot-*

ing *Pokratz v. Jones Dairy Farm*, 771 F.2d 206, 209 (7th Cir.1985)). The court may not substitute its judgment for the defendant's judgment, but rather "must determine whether in light of the relevant facts, [defendant] articulated a rational connection between the facts found and the choice made." *Smart v. State Farm Ins. Co.*, 868 F.2d 929, 936 (7th Cir.1989) (citation omitted) Indeed, a decision by the defendant will be upheld so long as the decision does not run contrary to Congressional intent, or entirely fail to consider an important aspect of the problem, or is not in accord with the plain meaning of the Policy or is so implausible that it could not be ascribed to a difference in view. *Id.* In applying this standard, the court only considers the evidence that was before the decisionmaker when it made its final decision. *Perry v. Simplicity Eng'g*, 900 F.2d 963, 966 (6th Cir.1990); *Crews v. Central States*, 788 F.2d 332, 336 (6th Cir.1986)[14] The court does not conduct a *de novo* evidentiary hearing. *Id.*

### C. Defendant's Decision To Deny Plaintiff Benefits Was Not Arbitrary or Capricious

 The ultimate issue that this court is called upon to resolve is whether any reasonable juror could conclude that the Plan administrator's decision to deny plaintiff benefits was arbitrary and capricious. Only if this question yields an affirmative answer must defendant's motion for summary judgment be denied.

The defendant insists that its decision was rational in light of the pre-existing condition provision in the Policy. Defendant characterizes the sickness for which plaintiff sought treatment during both the pre-existing period and in April, 1994 as "endometriosis." Hence, argues defendant, the pre-existing condition limitation commands that her claim be denied.

---

13. The Plan at issue states that "[t]he [defendant] Company has the discretion to construe and interpret the term [sic] of the Plan and the authority and responsibility to make factual determinations."

14. With its reply brief, defendant submits the affidavit of Dr. John J. Zadworny. He avers that

the logical conclusion to be made upon a review of the claim file is that plaintiff was diagnosed as having and been treated for endometriosis in November, 1993 and was treated for endometriosis on April 28, 1994. This court will not consider the affidavit of Dr. Zadworny because this affidavit is not a component of the claim file.

### 1. The Meaning of the Words "Medical Care or Treatment" in the Pre-Existing Condition Provision

The pre-existing condition limitation is triggered when a "covered person may have received medical care or treatment for an injury or sickness at any time during the 6 months before coverage starts under th[e] Plan." In order to determine whether plaintiff received medical care or treatment six months prior to the effective date of the Plan for the same injury upon which her claim is predicated this court must define the words "medical care or treatment." The Plan, itself does not define these terms. Federal common law rules of contract interpretation govern the performance of such a task. *Bullwinkel v. New England Mutual Life Ins. Co.,* 18 F.3d 429, 431 (7th Cir.1994) (holding that an employee health insurance policy is a contract, and under ERISA, a court is to apply federal common law rules of contract interpretation when construing terms of employee health insurance policies) (citation omitted). Such rules command a court to decide the meaning that a person of average intelligence and experience would attach to these words. *Id.* If there are two reasonable meanings, then the language is said to be "ambiguous" and must be construed against the insurer, unless extrinsic evidence allows the court to choose one plausible interpretation over the other as a matter of law. *Eley v. Boeing Co.,* 945 F.2d 276, 279 (9th Cir. 1991) (insurance policy language construed against drafter even if the language gives the plan administrator discretion to deny benefits) (*citing Kunin v. Benefit Trust Life Ins. Co.,* 910 F.2d 534 (9th Cir.)), *cert. denied,* 498 U.S. 1013, 111 S.Ct. 581, 112 L.Ed.2d 587 (1990).

In this case, the words "medical care or treatment" (hereinafter collectively "treatment") are certainly ambiguous because there are two equally plausible meanings for these words. On the one hand, "treatment" has been defined so as to encompass steps taken to effect a cure of an injury or disease, including examination and diagnosis. *Id.* (*citing* Blacks Law Dictionary 1346 (5th ed.1979)). On the other hand, "treatment" has been interpreted so as to exclude medical care for a condition until after the specific condition is known. *Karagon v. Aetna Life Ins. Co.,* 58 Mich.App. 677, 679, 228 N.W.2d 515 (1975) (holding that an insured did not receive treatment for multiple sclerosis, as the term was used in a pre-existing condition provision, until the insured "had been correctly diagnosed and appropriately treated during the period covered by the exclusion"). Plaintiff urges this court to adopt the latter definition. She insists that "treatment" is wholly different from a "check" or "examination" because these are utilized to rule out medical possibilities as the "cause" of the disease, and to establish one or multiple causes for the disease.

Recognizing the age-old edict that all ambiguities must be construed against the drafter, this court interprets the term "treatment" as plaintiff interprets it. Therefore, this court holds that plaintiff is not deemed to have been treated for a sickness or injury until the physician or insured is aware of the condition. *Hughes v. Boston Mutual Life Ins. Co.,* 26 F.3d 264 (1st Cir.1994) (holding that the word "treatment" in a pre-existing condition provision of an insurance policy was ambiguous and resolving that ambiguity in favor of the insured).

### 2. Plaintiff Received Medical Care or Treatment For a Pre-Existing Condition

Having defined "treatment," the court must now determine if there is any factual issue as to whether the administrator was arbitrary and capricious in deciding that plaintiff received treatment six months prior to the effective date of the Plan for the same injury or sickness on which her claim is based. The answer to this inquiry pivots on how one characterizes the condition for which plaintiff sought surgical treatment in April, 1994. Plaintiff contends that the she underwent surgery to remove a "functional cyst" at that time. She maintains that this functional cyst was not caused by endometriosis, which was an affliction for which she admits seeking treatment six months prior to the effective date of the Plan. She further asserts that the functional cyst could not have been present during the pre-existing period. Ergo, she contends that she could not have re-

ceived treatment for that cyst. In support of her position, she relies primarily on the affidavit of Dr. Lichten, the surgeon who removed the left ovary in 1994. Dr. Lichten's affidavit states as follows:[15]

1. That I [Dr. Lichten] am a Board Certified OB//GYN physician licensed to practice medicine in the State of Michigan.

2. That on April 28, 1994, I performed a D & C and a laparoscopic left oophorectomy[16] on Shelly Rakoczy.

3. That it is my understanding that Ms. Rakoczy underwent surgery in November of 1993 for the removal of small scattered areas of endometriosis.

4. That on April 28, 1994, I removed a 7 cm. corpus luteum cyst from Ms. Rakoczy's left ovary. This cyst was functional, meaning it was generated and/or created by increased hormonal activity.

5. That the cyst that I removed from Ms. Rakoczy's left ovary on April 28, 1994, was not a product of, or any way related to, endometriosis.

6. That the functional cyst that developed on Ms. Rakoczy's left ovary, and required surgery in April of 1994, was present and developing on said ovary, for a few weeks prior to April 28, 1994. Due to the fact that it was a functional cyst, it could not have been on her left ovary for a period exceeding three (3) months prior to the April 28, 1994, surgery referred to above.

7. That the microscopic diagnosis of endometrial curetting removed during the above-mentioned surgery revealed inactive endometrium.

8. That the functional cyst which I removed from Ms. Rakoczy's left ovary on April 28, 1994, was not related to, caused by, or the product of, any medical disease or condition which existed during the period of time spanning July, 1993 through January 1, 1994.

In retort, defendant makes a series of arguments to support its decision that the decision to deny benefits was not arbitrary and capricious. First, it contends that any attempt by plaintiff to stave off summary judgment by arguing that because the *cyst itself* did not exist during the pre-existing period that the treatment received for it was not for a pre-existing condition is futile. Defendant pointedly asserts that the relevant question is whether the *cyst was caused by* a pre-existing condition for which she received treatment during the pre-existing period, to wit: endometriosis. And upon a review of the claim file, particularly Dr. Zirkin's "Surgical Addendum Report," defendant believes it is self-evident that the cyst was caused by endometriosis.

Second, defendant urges this court to reject Dr. Lichten's affidavit out of hand. Defendant contends that his credibility is dubious at best. According to defendant, Dr. Lichten does not have a comprehensive understanding of plaintiff's medical condition in 1993. At paragraph eight he avers that "the functional cyst I [Dr. Lichten] removed from Ms. Rakoczy's left ovary on April 28, 1994, was not related to, caused by, or the product of, any medical disease or condition which existed during the period of time spanning July, 1993 through January 1, 1994." His affidavit indicates at paragraph 3 that he is aware that plaintiff "underwent surgery in November 1993 for the removal of small scattered areas of endometriosis." Defendant points out that the initial information submitted to defendant by Dr. Wickham reveals more treatment than the November, 1993 operation. Hence, defendant argues that Dr. Lichten does not have sufficient knowledge of plaintiff's medical conditions during the pre-existing period to make any conclusion as to whether the cyst he removed was caused by any such conditions.

Moreover, defendant denotes that Dr. Lichten in his affidavit ignores the "Surgical Addendum Report" regarding the test results of a second pathological study done by Dr. Zirkin on or about May 11, 1996—a

15. Dr. Lichten's affidavit is part of plaintiff's claim file. Therefore, it can be considered by this court in determining whether the Plan administrator's decision was arbitrary and capricious.

16. Once again, a laparoscopic left oophorectomy is a procedure whereby the left ovary is removed.

study Dr. Lichten, himself, ordered. The "Surgical Addendum Report" diagnosed the cyst removed on April 28, 1994 as an "endometrial cyst." Moreover, it is interesting that Dr. Lichten's affidavit discusses the results of the initial microscopic test of the endometrial curetting, which was that these specimens were comprised of "inactive endometrium." He presumably did so to give the impression that plaintiff's endometriosis was in remission, and thus could not have been the cause of the cyst. Yet, "inactive endometrium" does not mean that plaintiff's endometriosis was inactive, but rather that she had been taking birth control pills.

In short, defendant argues that its decision to deny plaintiff benefits was not arbitrary and capricious, and no rational fact-finder could conclude otherwise. Plaintiff concedes that she was treated for endometriosis during the pre-existing period. And, according to the defendant, Dr. Zirkin's Surgical Addendum Report gives it a sound basis for its decision that the cyst was caused by the pre-existing condition of endometriosis.

Viewing all the evidence in a light most favorable to the plaintiff, this court finds no genuine issue of material fact as to whether the defendant's decision to deny plaintiff benefits was arbitrary and capricious. It was not. Plaintiff admits that she was treated for endometriosis during the pre-existing period. The claim file is replete with evidence which would lead the Plan Administrator to conclude that the cyst removed in 1994 was a product of her endometriosis.[17] First, the diagnostic report of the pelvic ultrasound conducted on April 22, 1994 suggests the possibility that the cystic mass detected during the procedure may "represent an endometrioma with an area of internal hemorrhage that has formed a more solid component." Then, medical records filled-out the day of the surgery, April 28, 1994, indicate that plaintiff is being operated on for endometriosis. For example, in the "Admission History and Physical Examination" form, Dr. Lichten diagnoses plaintiff's condition as "endometriosis." Then, on an "Intra–Operative Nursing Assessment Record," both the pre-operative and post-operative diagnoses are "left ovarian cyst/endometriosis." However, the penultimate piece of evidence supporting defendant's position is the "Surgical Addendum Report" issued by Dr. Zirkin in May, 1994. In that report, he provides a final diagnosis of the cyst removed by Dr. Lichten in April, 1994 as an "endometrial cyst (endometriosis)." This diagnosis, by itself, unquestionably provides a sufficient basis for the Plan Administrator's decision to deny plaintiff benefits. Moreover, Dr. Lichten's affidavit, while disagreeing with Dr. Zirkin's diagnosis, does not impugn the veracity of Dr. Zirkin's diagnosis. Indeed, it does not even refer to his diagnosis. Why, it may be asked, if the subsequent pathological study was ordered by Dr. Lichten, does he refuse to reference the results in his affidavit or provide some explanation of his opinion that Dr. Zirkin's diagnosis is inaccurate? The only logical answer is that the diagnosis is accurate and it contradicts Dr. Lichten's position that "[t]he functional cyst that I [Dr. Lichten] removed from Ms. Rakoczy's left ovary on April 28, 1994, was not a product of, or any way related to, endometriosis."

In sum, this court finds that the Plan Administrator's decision to deny plaintiff benefits based on the pre-existing condition provision was not arbitrary and capricious. Defendant has articulated a satisfactory explanation for its action, including a rational connection between the facts found and choice made. *Smart v. State Farm Ins. Co.,* 868 F.2d 929, 936 (7th Cir.1989) (holding that plaintiff was appropriately denied reimbursement for drug and alcohol abuse treatment under policy limitation excluding coverage for any illness of which a reasonable person would have sought care or treatment prior to the date of enrollment, since a clinical psy-

17. Plaintiff cites a host of cases in her response brief which are not directly on point, including *Hughes v. Boston Mutual Life Ins. Co.,* 26 F.3d 264 (1st Cir.1994), *Karagon v. Aetna Life Ins. Co.,* 58 Mich.App. 677, 228 N.W.2d 515 (1975) and *Golden Rule Ins. Co. v. Atallah,* 45 F.3d 512 (1st Cir.1995). All three cases involved undiagnosed pre-existing conditions. In this case, endometriosis was a diagnosed pre-existing condition. Moreover, not one of these three cases was decided using the arbitrary and capricious standard of review, whereas this case uses that deferential standard. Furthermore, *Karagon* and *Golden Rule* are not even ERISA cases.

chologist recommended that plaintiff undergo psychotherapy to curb drug and alcohol problem prior to the effective date of enrollment) (citation omitted). Summary judgment must be entered in favor of defendant.

### ORDER

**IT IS HEREBY ORDERED** that defendant's motion for summary judgment be granted, and that plaintiff's complaint be dismissed on the merits.

**SO ORDERED.**